UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**RED DOOR LOUNGE, INC.**,

Debtor.

Case No. **15-61151-11**

# MEMORANDUM of DECISION

At Butte in said District this 14th day of October, 2016.

In this Chapter 11 bankruptcy, the Court held a hearing in Missoula after notice on October 6, 2016 on: (1) Debtor's Objection to Proof of Claim No. 4 filed by First Interstate Bank; (2) the Motion to Convert of Dismiss filed by First Interstate Bank, successor by merger to Mountain West Bank, N.A.; (3) the United States Trustee's Motion to Dismiss or Convert; (4) final approval of Debtor's Disclosure Statement filed June 7, 2016;[1] and (5) confirmation of the Debtor's Chapter 11 Plan filed June 7, 2016. In response to objections to approval of Debtor's Disclosure Statement filed June 7, 2016, Debtor filed an Amended Disclosure Statement on September 9, 2016. Debtor's counsel acknowledged certain inconsistencies in both the Disclosure Statement filed June 7, 2016 and the Amended Disclosure Statement September 9, 2016 and represented that Debtor would file a further amended disclosure statement. Given the concession by Debtor, approval of Debtor's Disclosure Statement and Amended Disclosure Statement is denied. Additionally, the Ballot Report filed September 13, 2016, relates to Debtor's Chapter 11 Plan filed June 7, 2016. Counsel for

---

[1] In this small business case and as permitted under 11 U.S.C. § 1125(f)(3)(A), the Court entered an Order on June 8, 2016, conditionally approving Debtor's Disclosure Statement filed June 7, 2016.

1

Debtor, First Interstate Bank and the United States Trustee ("UST") recognized that the ballots and the Ballot Report relate to Debtor's Chapter 11 Plan, which Plan was superseded by a First Amended Chapter 11 Plan filed September 9, 2016, at docket no. 63.  Given that approval of Debtor's Disclosure Statement and Amended Disclosure Statement was denied, and given that the filed ballots relate to a plan that was superseded, confirmation of any plan is premature at this time.  The Court thus proceeded with the hearing on the motions to dismiss or convert and on Debtor's Objection to First Interstate Bank's Proof of Claim.

This Court has jurisdiction of this Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a).  Debtor's Objection to First Interstate Bank's claim is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and the motions to dismiss or convert filed by the UST and First Interstate Bank are core proceedings under 28 U.S.C. § 157(b)(2)(A).  This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

Debtor was represented at the hearing by James A. Patten of Billings, Montana.  First Interstate Bank was represented at the hearing by Benjamin P. Hursh of Missoula, Montana.  The UST was represented at the hearing by Neal G. Jensen of Great Falls, Montana.  John C. Foster (Debtor's President and sole shareholder) and Jim Koontz (Debtor's accountant) testified and Exhibits 1 through 16 and Exhibits A, B and C were admitted into evidence.

## BACKGROUND

Debtor filed a prior Chapter 11 bankruptcy case on August 18, 2011.  *See* Case No. 11-61605-11.  Debtor's Chapter 11 plan was confirmed in that case on September 7, 2012.  As part of the confirmation process, Debtor entered into a stipulation with Mountain West Bank wherein Debtor and Mountain West Bank agreed to the following treatment of Mountain West Bank's secured claim:

2

>       The Allowed Secured Claim of Class Three Creditor, Mountain West Bank (the "Bank"), consists of the re-capitalized sum of the principal balances of the two loans (loan # 260005318 and loan no. 260005723) that were merged in into the prepetition Judgment in favor of the Bank against, plus accrued and unpaid interest and authorized fees and costs, in the total amount of $848,801.40 as of August 31, 2012. That Allowed Secured Claim shall be paid in 240 monthly installments commencing on the Effective Date at 4.25% per annum for the first 5 years (60 months) after the Effective Date equal to monthly payments of $5,256.68, and thereafter and on every five (5) years after the Effective Date during the repayment term, the interest rate shall be readjusted to an annual interest rate equal to the prime rate for major New York banks shown in the Wall Street Journal Money Section on that day plus 1% and the monthly payment shall be adjusted accordingly.

A final decree was entered and that case was closed on March 7, 2013.

Debtor commenced this Chapter 11 bankruptcy case on December 10, 2015. On Schedule D filed December 24, 2015, Debtor listed First Interstate Bank as having a secured claim in the amount of $683,102. On April 22, 2016, First Interstate Bank filed Proof of Claim No. 4 asserting a secured claim in the amount of $942,380.42. Attachments to Proof of Claim No. 4 show that Debtor has not made a payment to First Interstate Bank since June 4, 2014, that the remaining principal balance owing is $804,751.42 and that an additional $51,911.97 is owed in post-judgment interest. The attachments also show that First Interstate Bank is claiming $85,717.03 for the 2010-2014 real property taxes First Interstate Bank paid on August 28, 2015. Debtor objects to First Interstate Bank's Proof of Claim arguing that First Interstate Bank is not, under the approved stipulation with Mountain West Bank, entitled to late fees and charges and that the Proof of Claim should be allowed in the amount of $886,617.45. Debtor's objection does not provide any explanation as to how Debtor's counsel arrived at the figure of $886,617.45.

Despite having not made any payments to First Interstate Bank since June 2014, and despite having not paid any real property taxes since 2010, Debtor only had $5,015.00 in cash on hand and

an additional $352.00 in the bank at the time Debtor commenced this case on December 10, 2015.[2]
The Debtor derives its income from two sources; the rental of real property and the operation of a lounge and casino.  Per the Disclosure Statement filed June 7, 2016, Debtor intends to fund its Chapter 11 Plan with estimated monthly bar and lounge revenues of $25,685, gaming revenues of $4,364 and commercial leases of $8,000, for a total of $38,049 per month.   In the Amended Disclosure Statement filed September 9, 2016, Debtor adjusted its monthly revenue projections downward to $21,525 from its bar and lounge operations, $4,687 from its gaming operation, $7,328 from commercial leases and $1,793 from assignments of revenue by Montana Motors, Inc., for a total of $35,333 per month.[3]  While Debtor projects monthly income of $35,333, Debtor's Monthly Operating Report ("MOR") for December of 2015, shows Debtor's income that month was $30,589 and Debtor's expenses were $23,467; Debtor's MOR for January 2016 shows Debtor's income that month was $39,468 and expenses were $30,572; Debtor's MOR for February 2016 shows Debtor's income was $29,668 and expenses were $29,307; Debtor's MOR for March 2016 shows income was $32,652 and expenses were $30,396; Debtor's MOR for April 2016 shows income was $30,182 and expenses were $29,627; Debtor's MOR for May 2016 shows income was $29,915 and

---

[2] Debtor's cash balances, as shown on its bank statements in First Interstate Bank's Exhibit G, were as follows:  Debtor had cash in its bank account of $529.79 on June 30, 2014; $6,255.99 on July 31, 2014; a negative cash balance of $4,231.61 on August 29, 2014; $1,396.85 on September 30, 2014;  a negative cash balance of $3,978.72 on November 28, 2014; a negative cash balance of $4,324.53 on December 31, 2014; $876.47 on January 30, 2015; $3,751.72 on February 27, 2015; $1,888.17 on March 31, 2015; $1,150.91 on April 30, 2015; $1,098.40 on May 29, 2015; $1,117.94 on June 30, 2015; $408.32 on July 31, 2015; $754.98 on August 31, 2015; $1,455.10 on September 30, 2015; $7,378.64 on October 30, 2015; $2,330.48 on November 30, 2015; and $307.50 on December 10, 2015.

[3] In Debtor's approved disclosure statement in Case No. 11-61605-11, Debtor had projected, for the fiscal year ending June 30, 2015, that Debtor's gaming revenues would ne $8,877 per month, its bar and lounge revenue would be $31,566.50 per month and its rental income would be $5,205.92 per month.  Debtor projected slight increases in the foregoing numbers for the fiscal years ending June 30, 2016, and June 30, 2017.

expenses were $26,006; Debtor's MOR for June 2016 shows income was $42,339 and expenses were $26,470; and Debtor's MOR for July 2016 shows income that month was $33,213 and expenses were $35,920.

## DISCUSSION

### A. Debtor's Objection to First Interstate Bank's Proof of Claim.

"A proof of claim executed and filed in accordance with [the Federal Rules of Bankruptcy Procedure] shall constitute *prima facie* evidence of the validity and amount of the claim." FED.R.BANKR.P. 3001(f). This evidentiary presumption is a rebuttable one. *Litton Loan Servicing, LP v. Garvida (In re Garvida)*, 347 B.R. 697, 706 (9th Cir. BAP 2006); *In re Eiesland*, 19 Mont. B.R. 194, 208–09 (Bankr. D. Mont. 2001). "The mechanics of what it takes to rebut the Rule 3001(f) presumption are driven by the nature of the presumption as '*prima facie*' evidence of the claim's validity and amount." *Id*. at 706-07. Thus, a properly executed proof of claim constitutes *prima facie* evidence, and "[o]ne rebuts evidence with counter-evidence." *Id*.

Foster testified that Debtor quit making payments to First Interstate Bank because First Interstate Bank changed the terms of the stipulation that was approved in Debtor's prior bankruptcy case. The Court would note that Debtor has not moved to reopen Case No. 11-61605-11 to enforce the terms of the settlement or to modify its confirmed chapter 11 plan.[4] For purposes of Debtor's pending objection to claim, Debtor's own accountant concedes that the Proof of Claim filed by First Interstate Bank is consistent with the terms of the stipulation reached in Case No. 11-61605-11.

---

[4] Under § 1141(a), the terms of a confirmed plan are binding on all parties. Section 1127(b) provides that a chapter 11 plan may be modified before but not after "substantial consummation" of the plan. Taken together, "§§ 1127(b) and 1141(a) impose an important element of finality in chapter 11 proceedings, allowing parties to rely on the provisions of a confirmed reorganization plan." *Integon Life Ins. Corp. v. Mableton–Booper Assocs. (In re Mableton–Booper Assocs.)*, 127 B.R. 941, 943 (Bankr.N.D.Ga.1991).

The claim consists of principal, interest and five years of property taxes that were not paid by Debtor and were instead paid by First Interstate Bank in 2015.

The record in the case *sub judice* shows that First Interstate Bank executed and filed its proof of claim in accordance with the Federal Rules of Bankruptcy Procedure. Thus, its proof of claim provided *prima facie* evidence as to the validity and amount of its claim and the burden was thus on Debtor to supply sufficient evidence "tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Lundell v. Anchor Const. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (quoting *In re Holm*, 931 F.2d 620, 623 (9th Cir.1991)). Debtor failed to produce any evidence to cause the burden to revert to First Interstate Bank to prove the validity and amount of its claim. Debtor's objection to First Interstate Bank's claim is, therefore, overruled and First Interstate Bank's claim is allowed as filed.

### B. "Cause" for dismissal or conversion under § 1112(b)(1).

Conversion or dismissal is provided for at § 1112(b), which sets forth a nonexclusive list of factors that warrant conversion of dismissal. *In re Shockley*, 15 Mont. B.R. 114, 116 (Bankr. D. Mont. 1996); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382 (Bankr. E.D. Pa. 1991). Formerly, the analysis involved a two-step process, first to determine whether cause exists to dismiss or convert, and second whether dismissal is in the best interests of creditors and the estate. *In re BTS, Inc.*, 247 B.R. 301, 308-09 (Bankr. N.D. Okla. 2000) (quoting *In re Superior Siding & Window, Inc.*, 14 F.3d 240, 242 (4th Cir. 1994)); *In re Shockley*, 15 Mont. B.R. at 117 (quoting *Superior Siding*). Section 1112(b) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8 Stat. 23 § 442 (Apr. 20, 2005) and now provides:

(b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this

section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

(2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that –

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections to not apply, within a reasonable period of time; and

(B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A) –

(i) for which there exists a reasonable justification for the act or omission; and
(ii) that will be cured within a reasonable period of time fixed by the court.

\* \* \*

(4) For purposes of this subsection, the term 'cause; includes –

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

\* \* \*

(N) material default by the debtor with respect to a confirmed plan[.]

The determination under § 1112(b) rests with the sound discretion of the court. *Pioneer Liquidating Corp. v. United States Trustee (In re Consol. Pioneer Mortg. Entities)*, 264 F.3d 803, 806-07 (9th Cir. 2001); *In re Henson*, 289 B.R. 741, 752-53 (Bankr. N.D. Cal. 2003); *In re Shockley*, 15 Mont. B.R. at 116; *In re BTS, Inc.*, 247 B.R. at 309. The initial burden of proof is on the moving party. *In re BTS, Inc.*, 247 B.R. at 303.

7

Based on the evidence admitted at the hearing, this Court finds that "cause" is established under elements (A) (substantial or continuing loss or diminution of the estate and absence of a reasonable likelihood of rehabilitation) and (N) (material default by the debtor with respect to a confirmed plan).  First, Debtor is in material default under the terms of Debtor's confirmed plan in Case No. 11-61605-11.  Debtor has not made a monthly payment to First Interstate Bank since June 2014, and it has not paid any real property taxes since 2010.

Second, the Court finds that Debtor has no reasonable likelihood of rehabilitation.  At the commencement of this case, those amounts that Debtor should have paid under its confirmed plan, but did not, totaled $148,797.19 (18 payments of $5,256.68 each to First Interstate Bank and taxes of $85,717.03).  In its prior bankruptcy case, Debtor estimated that it would have net income of $147,717 as of the fiscal year ending June 30, 2013, $157,280 as of the fiscal year ending June 30, 2014, and $160,380 as of the fiscal year ending June 30, 2015, or $465,377 for the three years combined.  The foregoing numbers included property tax payments totaling $50,906.  Based upon Debtor's prior projections, Debtor should have had ample cash flow to make the payments to First Interstate Bank of $94,620.24 and pay the additional property taxes that exceeded what was in Debtor's projections.  If Debtor's prior projections were anywhere near accurate and because Debtor did not make its payments to First Interstate Bank or pay its property taxes, Debtor's cash balance should have been fairly substantial at the commencement of this case, yet Debtor only had $5,367.00 in cash and cash equivalents at the commencement of this case.  Hindsight shows that Debtor's projections in its prior bankruptcy case missed their mark.

In those prior projections that missed their mark, Debtor anticipated total receipts of $547,793 and total costs of sales of $242,254 (or a gross profit of $305,539) for the fiscal year ending June 30, 2015, and total receipts of $556,010 and total cost of sales of $245,887 (or a gross

profit of $310,123) for the fiscal year ending June 30, 2016.  In its projections filed in this case, Debtor anticipates annual gross receipts of $456,588 and annual cost of sales of $247,356, or a gross profit of $209,232; an amount that is $100,000 less than Debtor's prior projections.  Debtor's reality, which is in sharp contrast to any of Debtor's projections, is that Debtor has earned net income of $39,011.90 during the ninth month period of December 2015 through August 2016.  Debtor's monthly operating reports for those same months show that Debtor is on track to have annual gross receipts of $386,621 and annual cost of sales of $232,477, or a gross profit of $154,144.  Debtor's average operating expenses were $8,510.70 for the past nine months, or $76,596.30, which leaves Debtor with average monthly net income of $4,334.66.  From the foregoing amount, Debtor plans to pay its administrative expenses in addition to monthly payments to Class 1 through Class 4 creditors of $8,744.  Debtor's math simply does not compute.

      The evidence and testimony further exacerbate Debtor's current projections.  Foster testified that Debtor's current projections assume that Debtor is receiving the rental income from its tenants in a timely fashion and that tenants are sticking around so that all units are full.  At least one tenant is not paying its rent in a timely fashion and the evidence suggests that Debtor does not have all its rental units rented.  The Court has a duty under § 1129(a)(11) to protect creditors against "visionary schemes."  *Id.*; *In the Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985).  While a reorganization plan's success need not be guaranteed, the Court cannot confirm a plan unless it has at least a reasonable chance of success.  *Hungerford*, 19 Mont. B.R. at 120, quoting *Thomas*, 243 F.3d at 963; *Monnier Brothers*, 755 F.2d at 1341.  While Debtor cannot control whether its units are rented, or whether tenants are paying their rent in a timely fashion, Debtor's historical performance shows that Debtor's plan is not feasible.  In fact, Foster conceded during his testimony that Debtor's plan is not, at this date and time, feasible without an outside source of money coming in from third

9

parties.

Debtor's First Amended Chapter 11 Plan ("Plan") filed September 9, 2016, at docket no. 62, contemplates an infusion of cash from outside sources, namely, Foster and Montana Motors, Inc., a holding company owned solely by Foster. Unfortunately for Debtor, the outside sources of cash are speculative at best. According to Foster, Montana Motors, Inc. sold a piece of property under a contract for deed and receives approximately $1,793 per month under that contract for deed. Foster testified that he will contribute $1,731 of the $1,793 that Montana Motors, Inc. receives under the contract for deed to Debtor's monthly Plan payment. While those payments are critical to the feasibility of Debtor's Plan, Debtor did not produce any document that would obligate Montana Motors or Foster to assign those funds to Debtor every month.

Debtor's cash projection and budget also contemplates additional contributions by Foster of $28,000 in September 2016, and $10,060 in November 2016, May 2017 and November 2017, May 2018 and November 2018, May 2019 and November 2019, May 2020 and November 2020, May 2021 and November 2021. Foster was unsure about the $28,000 contribution that would be required at the time of confirmation and thought perhaps that number should be removed from Debtor's projections. Foster was equally noncommital about the other eleven contributions of $10,060 each. Foster testified that he would have the money if necessary, but stopped short of disclosing the source of such funds. Foster attempted to deflect questioning about his contributions stating a lot depended on what happened with First Interstate Bank's claim.

First Interstate Bank's claim is not an unknown at this juncture. The Court has overruled Debtor's objection to First Interstate Bank's claim; the claim is allowed as a secured claim in the amount of $942,380.42. Debtor's monthly payment on First Interstate Bank's claim should be roughly $5,962. Debtor's projections provide for a monthly payment to First Interstate Bank of

$5,490.[5]  The allowance of First Interstate Bank's claim as filed would require Debtor to increase the funding of its Plan by an additional $5,664 per year.

Finally, counsel for First Interstate Bank highlighted a discrepancy between Exhibit F attached to Debtor's Plan, which shows that $32,000 in administrative expenses are payable on the effective date of the plan, and Exhibit G attached to that same plan, which only provides for payment of $18,000 of administrative fees on the effective date of the plan.  If Foster could not contribute $28,000 upon confirmation and factoring in the $14,000 discrepancy, it is clear that Debtor's plan would fail immediately upon confirmation.

Section 1112(b)(4)(A) requires the bankruptcy court to find an absence of a reasonable likelihood of rehabilitation.  "The issue of rehabilitation for purposes of § 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort."  *In re Wallace*, 2010 WL 378351 at *4 (Bankr. D.Idaho Jan. 26, 2010) (quotations and citations omitted).  "Rehabilitation is a different and much more demanding standard than reorganization."  *In re Creekside Senior Apartments, L.P.*, 489 B.R. at 61 (citing *In re Brutsche*, 476 B.R. 298, 301 (Bankr.D.N.M.2012) (citing 7 COLLIER ON BANKRUPTCY at ¶ 1112.04[6][a][ii] )).  Foster maintained throughout his testimony that Debtor's Plan could work without his contributions.  Debtor's historical performance, coupled with the uncertainty surrounding Foster's contributions, the $14,000 discrepancy and the fact that Debtor's cash projections and budget provide for a monthly payment of $5,490 to First Interstate Bank, when such payment should be $5,962, shows that Debtor's Plan simply has no chance of success and that

---

[5] Interestingly, Debtor's Plan lists First Interstate Bank's claim as $886,617.45, and Debtor's monthly payment on that amount would be approximately $5,609, an amount less than what is provided for in Debtor's cash projections.

11

Debtor has no reasonable likelihood of rehabilitation. Moreover, the Court cannot envision any set of circumstances that would change such finding. For the reasons discussed above, cause exists for the dismissal or conversion of this case under § 1112(b)(1).

### C. Best Interests of Creditors and the Estate.

The Court must next decide whether dismissal, conversion, or the appointment of a trustee is in the best interests of creditors, and whether unusual circumstances exist that establish whether dismissal or conversion is not in the best interests of creditors and the estate. *In Re Sullivan*, 522 B.R. 604, 612 (9th Cir. BAP 2014); *In re Hinesley Family Ltd. Partnership No. 1*, 460 B.R. 547, 552-53 (Bankr. D. Mont. 2011). This Court can find no unusual circumstances contemplated in § 1112(b) in this record which establish that converting or dismissing the case is not in the best interests of creditors in the estate.

Turning to the evidence relating to the best interests of the creditors, this Court initially notes that First Interstate Bank seeks conversion of this case to Chapter 7. First Interstate Bank argues for conversion to a Chapter 7 liquidation arguing such conversion will maximize the value of Debtor's estate and the distribution to unsecured creditors by minimizing administrative expenses and the additional accrual of property taxes. The UST argues for either conversion or dismissal. Neither First Interstate Bank nor the UST argue for the appointment of a Chapter 11 trustee.

In *Sullivan,* the BAP concluded that the bankruptcy court abused its discretion when it dismissed a chapter 11 case as a bad faith filing "by failing to consider whether conversion or dismissal was in the best interests of all creditors and the estate." 522 B.R. at 612. The BAP wrote that the bankruptcy court "had an independent obligation under § 1112 to consider what would happen to all creditors on dismissal and, in light of its analysis, whether dismissal or conversion would be in the best interest of all creditors, not just the largest and most vocal creditor. *See In re*

*Owens*, 552 F.3d at 961 (agreeing with the Fourth Circuit that "when deciding between dismissal and conversion under 11 U.S.C. § 1112(b), 'the court must consider the interest of all of the creditors.'") (quoting *Rollex Corp. v. Assoc. Materials (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir.1994))." *Sullivan*, 522 B.R. at 613.

The BAP explained:

> When determining the best interests of the creditors under § 1112(b), the Code's fundamental policy of achieving equality among creditors must be a factor considered, "and it is not served by merely tallying the votes of the unsecured creditors and yielding to the majority interest. *Rollex Corp. v. Assoc. Materials (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994); and *see In re Graphic Trade Bindery, Inc.*, 2012 WL 1232089 at *5, 2012 Bankr.LEXIS 1598 at *17 (Bankr. D.Md. April 12, 2012) ("the mere fact that a section 1112(b) motion seeks only conversion is no bar to dismissal if the court determines that dismissal is in the best interests of creditors and the estate. The opposite is also true. The task of the bankruptcy court is to determine which option is the better choice.").

*Sullivan*, 522 B.R. at 613.

The BAP reversed the bankruptcy court's dismissal of the case in *Sullivan* when the bankruptcy court did not consider the option of conversion instead of dismissal. *Sullivan*, 522 B.R. at 612, 613. The unrefuted evidence in *Sullivan* was that certain creditors had judgment liens superior to all of the unsecured creditors upon dismissal, but the judgment liens were subject to attack as preferences. *Id.* at 613. In addition, no evidence existed that the unsecured creditors had any avenue for meaningful payment outside of a bankruptcy case and recovery of a tax refund would be enhanced in bankruptcy. *Id.* From this evidence the BAP concluded that dismissal was far less advantageous than conversion of the case for all creditors of the estate other than the judgment creditors; the BAP reversed dismissal because it was not harmless error. *Id.*

Dismissal of the case would force First Interstate Bank to proceed with foreclosure against the Debtor in district court. The loss of assets to foreclosure would harm the unsecured creditors if

13

the case is dismissed.

On the other hand, if the case is converted to chapter 7 or a trustee is appointed in chapter 11, the automatic stay would remain in place and a trustee would be appointed to investigate the Debtor's business affairs and marshall assets. No evidence exists in the record that the unsecured creditors "have any avenue for prompt or meaningful payment outside a bankruptcy case." *Sullivan*, 522 B.R. at 613.

This Court, when considering whether to dismiss the case, convert to chapter 7, or appoint a trustee, is convinced that the evidence shows that dismissal would be "far less advantageous for all creditors of the estate" than conversion. *See Sullivan*, 522 B.R. at 613. While it is certainly possible that Debtor could, upon dismissal of this case, continue with its operations and repay all its creditors, it is in this Court's view, unlikely given Debtor's historical performance. A trustee appointed in either chapter 7 or 11, by contrast, would start with a blank slate with creditors and the UST. A trustee could preserve estate property, marshall assets and could investigate the Debtor's businesses and financial affairs.

Weighing all factors and after consideration of the evidence and the factors enumerated in *Sullivan*, 522 B.R. at 613, this Court finds and concludes that conversion or appointment of a trustee in chapter 11 is far more advantageous to all creditors than dismissing the case and leaving Foster in control.

Turning to conversion versus appointment of a trustee in chapter 11, the Court concludes that conversion to chapter 7 is in the best interests of creditors and the estate. While the Debtor has an ongoing business, appointment of a trustee in chapter 11 pursuant to § 1104(a) would impose distractions and, in this Court's view, unnecessary and substantial costs and expenses related to the preparation of a disclosure statement and plan, approval of a disclosure statement, dissemination to

creditors, solicitation, voting and participating in chapter 11 plan confirmation proceedings. In a chapter 7 case a trustee would eliminate all of those administrative burdens and expenses and would be able to investigate the Debtor's financial affairs and liquidate Debtor's assets. What limited authority a trustee may need to operate a business of the Debtor in chapter 7, the trustee can request from this Court under 11 U.S.C. § 721.

After review of the record, this Court finds and concludes that conversion of the case to a case under Chapter 7 is in the best interests of creditors and the estate. Accordingly, First Interstate Bank and the UST's Motions to Convert are granted and this case is converted to a case under Chapter 7.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a).

2. Debtor's Objection to First Interstate Bank's claim is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

3. The UST and First Interstate Bank's motions to dismiss or convert are core proceedings under 28 U.S.C. § 157(b)(2).

4. Cause exists under 11 U.S.C. §§ 1112(b)(1) & (b)(4)(A) and (N) to dismiss or convert this case to a case under Chapter 7 of the Bankruptcy Code.

5. Conversion of the case to Chapter 7 is in the best interests of creditors and the estate.

6. No unusual circumstances are shown by the evidence, which establish that converting the case is not in the best interests of creditors and the estate.

In accordance with the foregoing, the Court will enter a separate order providing as follows:

IT IS ORDERED that final approval of Debtor's Disclosure Statement is DENIED; and

approval of Debtor's Amended Disclosure Statement is DENIED.

IT IS FURTHER ORDERED that Debtor's Objection to Proof of Claim No. 4 filed by First Interstate Bank is OVERRULED.

IT IS FURTHER ORDERED that the Motions to Convert filed by First Interstate Bank, successor by merger to Mountain West Bank, N.A., and the United States Trustee, are GRANTED; and this case is immediately converted to Chapter 7 of the Bankruptcy Code.

IT IS FURTHER ORDERED that the Motions to Dismiss filed by First Interstate Bank and the United States Trustee are DENIED as moot.

_____
Honorable Ralph B. Kirscher
Chief U.S. Bankruptcy Judge